**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1751-16T2

B.H.M.,

    Plaintiff-Respondent,

v.

L.E.P.-M.,

    Defendant-Appellant.

_____

Argued January 16, 2019 – Decided February 20, 2019

Before Judges Alvarez and Mawla.

On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Monmouth County, Docket No. FM-13-0363-12.

Andrew M. Shaw argued the cause for appellant (The DeTommaso Law Group, LLC, attorneys; Andrew M. Shaw and Michael J. DeTommaso, on the briefs).

John F. DeBartolo argued the cause for respondent (Atkinson & DeBartolo, PC, attorneys; John F. DeBartolo, on the brief).

PER CURIAM

Defendant L.E.P-M.[1] appeals from a November 18, 2016 judgment of divorce following a lengthy trial. She challenges the trial judge's findings regarding custody, alimony, child support, equitable distribution, counsel fees, and credibility. We affirm in all respects, but reverse and remand specific aspects of the alimony and child support determination for further consideration.

The following facts are taken from the record. The parties were married in 2000. Two children were born of the marriage in 2004 and 2006, respectively. The older child was diagnosed with Asperger's syndrome and the younger child suffers from asthma.

Before the marriage, defendant earned approximately $35,000 as an office manager. She also worked as a cosmetician specializing in aiding injured and disfigured individuals. Her work was featured in numerous magazine articles. Defendant also owned patents and had authored a chapter in a plastic surgery textbook published in 2000. In 2008, she earned a bachelor's degree in psychology from Rutgers University.

Plaintiff B.H.M. possessed a master's degree in computer science and was employed as a software engineer, earning $125,000 in 2001. In 2008 and 2010, he received 500,000 and 406,000 stock options, respectively, from his employer

---

[1] We use initials to protect the confidentiality of the parties and their children.

valued at one cent per share. In 2012, post-complaint, he received 593,750 options also valued at one cent per share. The value of the options remained the same at trial.

In August 2011, defendant claimed plaintiff assaulted her and she obtained a temporary restraining order (TRO), which was later dismissed. Plaintiff vacated the marital residence and lived with his mother. On August 22, 2011, he filed a complaint for divorce and an order to show cause seeking, among other relief, joint legal and physical custody of the children. On August 26, 2011, the court entered a pendente lite consent order, which required plaintiff to pay for certain expenses and pay support to defendant and the children. The parties' consent order also awarded them shared parenting time. Specifically, defendant was designated parent of primary residence (PPR) and enjoyed exclusive use of the marital residence. Plaintiff had the children two evenings per week and every other weekend.

In December 2011, defendant filed a motion to modify the consent order and requested sole legal and physical custody of the children, more than double the amount of pendente lite support, and a custody evaluation. Defendant's requests were denied.

A-1751-16T2

The parties' motion practice continued in 2012. Relevant to this appeal, defendant renewed her request for a custody evaluation. The motion judge denied her request, and instead ordered a custody neutral assessment (CNA) and custody mediation.

In July 2012, defendant contacted the Division of Child Protection and Permanency (Division) and claimed plaintiff had not provided sufficient funds for the children's allergy medications. Plaintiff informed the Division he had provided the funds to defendant and she used them to purchase oxycodone. Defendant had been prescribed the drug as a result of ankle surgery she had in 2012. However, the Division's investigation established that more than one physician prescribed oxycodone for defendant and she had filled the prescriptions at various pharmacies. A Division caseworker who visited the marital residence discovered butcher paper covering the windows, which defendant claimed she had installed for privacy. The Division also learned defendant had self-medicated the youngest child's asthma with an oral steroid. The children's allergist informed the Division that defendant historically did not follow doctor's instructions, but relied on her own intuition regarding the children's medications. She also spoke badly of plaintiff in front of the children,

"flies off the handle all the time," "screams at my staff," and kept a cat even though the children were allergic to it.

In September 2012, the children began attending public school because the parties could no longer afford private school. The children received good grades in public school, but had many absences. Defendant testified they were not really learning and did not deserve their grades.

In October 2012, Superstorm Sandy damaged the former marital residence. Defendant filed a claim with FEMA, administered in conjunction with the New Jersey Department of Community Affairs Reconstruction, Rehabilitation, Elevation and Mitigation program. The claim contradicted a statement defendant made in December 2012 to the New Jersey Senate Budget and Appropriations Committee, in which she asserted the home had suffered minimal damage from Sandy. Defendant applied as a low-to-moderate income family and claimed a yearly household income of $16,500, which represented the support she received from plaintiff. Plaintiff refused to sign the grant application because he believed the insurance proceeds were sufficient to repair the damage. Also, the parties' income exceeded the eligibility limits for a FEMA grant. The parties' insurance eventually paid $13,069.64, which nearly equated a repair estimate for the damage.

5

Defendant filed another motion for increased support, which was denied. The motion judge concluded:

> defendant has not provided any rational basis whatsoever for relief, and [] she has not been candid with the [c]ourt. Defendant's [case information statement] shows credit card debt in excess of $39,000, [and] monthly expenses in excess of $10,000 . . . . Clearly, defendant has failed to come to grips with the reality that both parties are debt-ridden and their financial circumstances must change.

Meanwhile, the Division's investigation had turned into litigation, and the judge handling that matter ordered defendant to undergo a psychological evaluation. In January 2013, defendant contacted police and claimed plaintiff hit her with the car door.

Plaintiff filed an order to show cause seeking sole legal and physical custody of the children because defendant was not following the allergist's orders, stopped giving the children their allergy medication, and permitted them to sleep with the cat. Plaintiff also claimed the children had excessive absences from school while in defendant's care and expressed concerns of her prescription drug abuse. Plaintiff's motion attached Division reports confirming his claims.

On January 11, 2013, the motion judge filed an order granting plaintiff sole custody of the children and supervised parenting time for defendant.

6

Defendant filed a custody related order to show cause seven days later, which was denied.

Dr. Mark Singer, Ed.D. performed a psychological evaluation of defendant on behalf of the Division and issued a report in February 2013. Singer concluded the parties had a highly conflictual relationship, but found defendant was sensitive to the children's needs, had a clear understanding of the role of parent and child, and valued the children's empowerment. Singer diagnosed defendant with histrionic personality disorder with obsessive compulsive features. Singer's report stated: "This report is intended to be use[d] only for the stated purposes and not intended to be used as a custody evaluation."

Nonetheless, defendant attached Singer's report to her certification in opposition to plaintiff's order to show cause seeking custody. Her certification also referred to the caseworker's report. An initial hearing occurred and the court granted defendant three visits per week with the children. The matter was then set down for a trial of the custody issue. The parties appeared for trial on April 3, 2013, but instead entered into a consent order agreeing to shared, equal custody, and other relief, which continued unchanged throughout the remaining five years of the litigation and through the trial. The Division terminated its litigation in June 2013.

In July 2013, defendant filed for Chapter 7 bankruptcy. The bankruptcy resulted in a discharge of: $65,000 in legal fees defendant owed to three attorneys; and credit card debt, including more than $30,000 owed to American Express, $13,705 to Chase, and $7285 to Citibank. Plaintiff retained counsel and participated in the bankruptcy proceedings in order to protect the marital residence from liquidation by the trustee. He paid his counsel $5429.53 for these services.

Throughout 2014, defendant continued to exhibit erratic behavior with regard to the children. She engaged in a conflict with their therapist and ultimately terminated therapy. She assaulted the younger child during a pediatric visit causing the pediatrician to expel the family from the practice. She threatened to notify the Division if plaintiff did not take the older child to the doctor for a cold. Defendant traveled to plaintiff's home with the police to compel him to fill a prescription for the child's antibiotics. During a doctor's visit with the older child's ophthalmologist, defendant asked plaintiff to explain to the children why he broke up the family. Defendant told plaintiff "I'm going to be suing you . . . we're going to be litigating until the end of your life." A physical altercation ensued. Defendant claimed plaintiff assaulted her, which

led police to arrest plaintiff. Defendant filed a criminal complaint and both parties obtained TROs, which were later dismissed.

The parties continued to communicate regarding their daughter's glasses. Plaintiff asked defendant to fill the prescription and stated he would reimburse her up to $125. Defendant responded with a series of emails, including the following:

> [Y]ou are mentally delusional . . .
>
> . . . .
>
> . . . You caused irreparable harm to me and the children through your continued abuse and psychopathology.
>
> You are a sick man . . . .
>
> . . . [S]top your campaign of hate and harm against me and the kids, and start thinking about how to survive the imminent collapse of the dollar which will cause civil upheaval and martial law.
>
> . . . Stop and think what you will do when the government puts an RIF chip in everyone and our new currency is located in this chip. If you don't cooperate they turn your chip off and you have no money.
>
> . . . .
>
> . . . You have forced us into total financial destitution.

A-1751-16T2

Defendant filled the eyeglass prescription herself and ignored plaintiff's requests that she give him proof of the expenditure in order to reimburse her. In response to one such request by plaintiff, defendant stated the following:

> Get professional help before you destroy these children. You cannot handle co-parenting or any parenting. Money is only God to those who practice service to self. It corrupts as it has corrupted you.
>
> Earth is changing. It is going into [Fifth dimension] which represents a positive timeline of ["]unity consciousness["] or service to others. Those stuck on the wheel of karma don't go. They stay on [third dimension] earth and live out what they created. Those are service to self or negative timeline.

Defendant sent plaintiff several more emails in this vein, all of which were admitted into evidence.

The CNA commenced in February 2015. In her CNA questionnaire, defendant wrote "irreparable harm [was] caused to my children[] and myself that is unconscionable, by the vindictive and criminal behavior of their [f]ather." She told the CNA evaluator plaintiff was autistic and an incompetent parent. At trial, the evaluator testified: defendant's thoughts were disjointed, she was focused on medical issues and believed plaintiff was not taking care of the children's medical needs, and her emails to plaintiff "reveal[ed] a troubling pattern of paranoid and delusional thinking." The evaluator met with the

10

children and noted they had substantial knowledge of the parties' dispute and were "coached," because their answers to questions mirrored defendant's statements.

He concluded the following: the marriage was volatile and chaotic; defendant estranged the children from plaintiff; the children had a skewed allegiance to their mother, who failed to insulate them from her negative feelings about their father; defendant expressed significant concerns about the children's health, but did not follow medical advice; her emails contained a "troubling pattern of paranoid and delusional" thinking; and the children discussed plaintiff with "derision and contempt" and in "inappropriate and disrespectful" terms.

The evaluator expressed concerns about defendant's "stability to parent effectively," given her "delusional thought content," her "Munchausen's-like preoccupation with [the children's] medically complex issues," and her failure to adhere to the children's medical regimens. He recommended shared parenting, the appointment of a parenting coordinator, and a parenting schedule with minimal transfers between the parties' homes.

Defendant's erratic conduct continued during the trial, which commenced in February 2016. The children were visiting with plaintiff at his mother's home

for Easter when defendant contacted police and claimed plaintiff was abusing the older daughter. Police responded and determined there was no abuse.

In May 2016, the trial judge relieved defendant's counsel, her seventh attorney, because she claimed he had assaulted her in the courthouse. Defendant represented herself for the remainder of the trial. The judge surmised she accused her attorney of assault in order to represent herself in order to provide "unfiltered" testimony to the court. The trial transcripts confirm the judge's impressions. Defendant's presentation was disorganized and unnecessarily prolonged the trial. Defendant interrupted testimony, sought to adduce evidence which had either not been provided in discovery or was irrelevant, and failed to comply with evidence and court rules.

Defendant adduced a CIS dated September 28, 2011, nearest the date of the complaint, which had not been updated and contained errors. Defendant characterized the parties' standard of living as "upper middle class" because they lived in a home with a view of the ocean.

Defendant requested the court designate her as the PPR, and for plaintiff to have parenting time two evenings per week and every other weekend. She requested $434 per week for child support and $300 per week alimony for twenty years.

At the time of trial, defendant was forty-seven years of age and enrolled in the master's in public policy program at Monmouth University. She testified she was a homemaker and had been absent from the job market for sixteen years. She stated her plan was to turn the former marital residence into a bed and breakfast over a period of ten years. Defendant also claimed she was interested in pursuing a career in academia and worked as an unpaid intern for the ambassador of the Global Mission of Peace.

Plaintiff was fifty-two at the time of trial. He presented an up-to-date CIS and testified his salary was $150,800 per year. He described the marital and non-marital assets and liabilities in detail, and explained the relief he sought from the court. He testified he had been granted one million stock options, 740,234 of which were vested as of October 2014. Plaintiff requested the court order a shared parenting time plan in accordance with the CNA.

Early in the trial, defendant alleged the former marital residence was dangerous because of mold infestation. She urged the trial judge to contact the Division to inquire as to the issue. The trial judge obliged and learned the mold issue had been resolved. The Division also informed the judge it had no concerns regarding either party's ability to parent the children.

On November 18, 2016, the judge entered a dual judgment of divorce and attached a written opinion totaling 188 pages, addressing custody and parenting time, alimony, child support, equitable distribution, and counsel fees. The judge found plaintiff's testimony credible, especially as it related to defendant's conduct during the divorce. She found defendant not credible. This appeal followed.

I.

> [F]indings by a trial court are binding on appeal when supported by adequate, substantial, credible evidence. Cesare v. Cesare, 154 N.J. 394, 411-12 (1998). We defer to the credibility determinations made by the trial court because the trial judge "hears the case, sees and observes the witnesses, and hears them testify," affording it "a better perspective than a reviewing court in evaluating the veracity of a witness." Id. at 412 (citing Pascale v. Pascale, 113 N.J. 20, 33 (1988)).
>
> If the trial court's conclusions are supported by the evidence, we are inclined to accept them. Ibid. We do "not disturb the 'factual findings and legal conclusions of the trial judge unless . . . convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice.'" Ibid. (quoting Rova Farms Resort, Inc. v. Inv'rs Ins. Co. of Am., 65 N.J. 474, 484 (1974)). "Only when the trial court's conclusions are so 'clearly mistaken' or 'wide of the mark'" should we interfere to "ensure that there is not a denial of justice." N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008) (quoting N.J.

Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 605 (2007)).

[Gnall v. Gnall, 222 N.J. 414, 428 (2015).]

"Appellate courts accord particular deference to the Family Part because of its 'special jurisdiction and expertise' in family matters." Harte v. Hand, 433 N.J. Super. 457, 461 (App. Div. 2013) (quoting Cesare, 154 N.J. at 412). However, "[t]his court does not accord the same deference to a trial judge's legal determinations." Ricci v. Ricci, 448 N.J. Super. 546, 565 (App. Div. 2017) (citing Reese v. Weis, 430 N.J. Super. 552, 568 (App. Div. 2013)). Rather, "all legal issues are reviewed de novo." Ibid.

Defendant challenges the judgment in virtually every respect. We address the arguments warranting a discussion below.

A.

Defendant contests the trial judge's custody determination. She argues: the judge relied upon Division records, reports, and conversations with caseworkers outside of the record, which were hearsay; the CNA evaluation was a net opinion; the award of joint legal custody was erroneous because the trial judge found the parties had an inability to communicate and agree on matters related to the children; the custody determination was unduly influenced by the parties' pendente lite consent order, which she asserts was engendered by a

15

frivolous order to show cause filed by plaintiff; and a guardian ad litem should not have been appointed without notice to the parties and an opportunity to be heard.

The Legislature has declared it public policy that children have access to both parents, and parents share the rights and responsibilities of child rearing. N.J.S.A. 9:2-4. Where parents disagree on custody and parenting time, the court is charged with determining the best interests of the child, specifically, by considering the factors set forth in N.J.S.A. 9:2-4(c) in making a custody and parenting time award. The court's primary consideration is the best interests of the child, which include the child's safety, happiness, and physical, mental, and moral welfare. Kinsella v. Kinsella, 150 N.J. 276, 317 (1997); Faucett v. Vasquez, 411 N.J. Super. 108, 118 (App. Div. 2009). Because Family Part judges are often called upon to make difficult and sensitive decisions, their determinations are entitled to deference given their familiarity with the details of the case. Hand v. Hand, 391 N.J. Super. 102, 111 (App. Div. 2007).

Here, the trial judge ordered an equal shared parenting and custody arrangement. She relied upon the parties' testimony, including plaintiff's support of such an arrangement and the CNA. Additionally, the judge considered the statutory factors, and found: the parties had a dysfunctional and

16

highly conflictual relationship and were not able to communicate, largely because of defendant's behavior; defendant was hostile, angry, abusive, and erratic; with respect to multiple incidents at doctors' offices, defendant resorted to violence because she believed she was always correct; plaintiff was more willing to afford parenting time to defendant; defendant disparaged plaintiff to the children; minimizing the transfers between the parties' homes would be best for the children; plaintiff's reluctance to be alone in a room with defendant, or to speak to her, was due to defendant's erratic, angry, violent outbursts; and plaintiff was able to provide a stable home environment. The judge also considered the special needs of the child with Asperger's.

Additionally, the judge made extensive and detailed findings that defendant was "incredible, unbelievable and untruthful." The judge attributed this to defendant's "mental health, a personality disorder, PTSD, and desire to seek revenge against plaintiff for having deigned to [seek] . . . sole legal and physical [custody] of the parties' two children" when he filed an order to show cause pendente lite.

We reject defendant's challenges to the custody determination. A pendente lite order was entered by a different judge, in which defendant was ordered to remove the cat. Moreover, there was testimony on this issue at trial.

Therefore, this aspect of the judge's findings were a part of the record. Furthermore, although the Division's records were not a part of the trial record, the trial judge contacted the Division at defendant's behest regarding her complaint of mold in the former marital home and to determine whether the living conditions there were satisfactory. The information the judge received from the Division did not prejudice defendant because the Division advised it had no concerns regarding either party's parenting ability.

Defendant did not object to the trial judge's consideration of the Division's expert report and her counsel utilized the document for cross-examination of the CNA evaluator. "A party who consents to, acquiesces in, or encourages an error cannot use that error as the basis for an objection on appeal." Spedick v. Murphy, 266 N.J. Super. 573, 593 (App. Div. 1993) (citing State v. Harper, 128 N.J. Super. 270, 276-77 (App. Div. 1974)).

The CNA was not a net opinion because the evaluator relied on more than the Division's expert report. Indeed, the evaluator's credentials and expertise were not challenged. He conducted his own investigation before issuing his report, namely, consulting collateral sources, and interviewing the children and both parties. As we noted, the Division's expert report was evidential. The

evaluator's report explained the evaluative process and the conclusions drawn from it.

> A net opinion is "a bare conclusion unsupported by factual evidence." Creanga v. Jardal, 185 N.J. 345, 360 (2005). To avoid a net opinion, the expert must "'give the why and wherefore' that supports the opinion." [Townsend v. Pierre, 221 N.J. 36, 54 (2015)] (quoting Borough of Saddle River v. 66 E. Allendale, LLC, 216 N.J. 115, 144 (2013)).
>
> Experts are required to "be able to identify the factual bases for their conclusions, explain their methodology, and demonstrate that both the factual bases and the methodology are reliable." [Townsend, 221 N.J.] at 55 (quoting Landrigan v. Celotex Corp., 127 N.J. 404, 417 (1992)). The net opinion rule is a "prohibition against speculative testimony." [Harte, 433 N.J. Super. at 465] (quoting Grzanka v. Pfeifer, 301 N.J. Super. 563, 580 (App. Div. 1997)).
>
> [Ehrlich v. Sorokin, 451 N.J. Super. 119, 134 (App. Div. 2017).]

Neither the CNA nor the evaluator's testimony fit this description.

The trial judge expressed concerns regarding the parties' ability to co-parent and also addressed defendant's claims regarding the order to show cause plaintiff had filed for custody. The judge's concerns regarding communication emanated from defendant's conduct. Indeed, the judge found the parties had a "limited ability to agree, communicate or cooperate on anything" because defendant was "unreasonable" and tried to "get her way" by becoming "hostile

A-1751-16T2

and angry" and took "no responsibility for her behavior[.]" The judge also cited defendant's insistence the order to show cause was evidence of bad faith as evidence of her inability to let go of her anger. As we noted, the decision to grant the order to show cause was borne of concern defendant could be abusing prescription drugs and not meeting the children's medical needs. Thus, the order to show cause could not be characterized as frivolous.

Given the totality of the circumstances, we fail to see how defendant could have achieved a better result custody-wise. The record clearly supports the judge's decision to appoint a guardian ad litem and the custody determination as a whole, and we will not disturb it.

B.

Regarding the alimony determination, defendant argues the trial judge: failed to include income from plaintiff's receipt of the stock options in determining his ability to pay; incorrectly imputed income to defendant and failed to account for the costs of child care necessary for her to obtain full-time employment; artificially adjusted the marital lifestyle downward; incorrectly calculated defendant's tax rate; incorrectly analyzed her CIS; and did not allocate the surplus in plaintiff's income to meet her needs.

20

Courts may award alimony "as the circumstances of the parties and the nature of the case shall render fit, reasonable and just[.]" N.J.S.A. 2A:34-23. In a review of an alimony award, we defer to the trial judge's findings. Overbay v. Overbay, 376 N.J. Super. 99, 106 (App. Div. 2005). We will not overturn an alimony award unless we find

> the trial court clearly abused its discretion or failed to consider all of the controlling legal principles, or we must otherwise be satisfied that the findings were mistaken or that the determination could not reasonably have been reached on sufficient credible evidence present in the record after considering all of the proofs as a whole.
>
> [Gonzalez-Posse v. Ricciardulli, 410 N.J. Super. 340, 354 (App. Div. 2009) (citing Rolnick v. Rolnick, 262 N.J. Super. 343, 360 (App. Div. 1993)).]

However, "failure to consider all of the controlling legal principles requires a remand." Ibid. (quoting Boardman v. Boardman, 314 N.J. Super. 340, 345 (App. Div. 1998)). "An alimony award that lacks consideration of the factors set forth in N.J.S.A. 2A:34-23(b) is inadequate[.]" Crews v. Crews, 164 N.J. 11, 26 (2000).

Here, the trial judge considered the statutory factors and awarded defendant limited duration alimony of $600 per week payable for six years following the sale of the marital residence. The duration of alimony awarded

21

considered the period of pendente lite support, which lasted five years and three months.  The judge also imputed income of $32,000 per year to defendant and utilized a seven percent tax rate for defendant to determine the alimony sum.

We reject defendant's claim the income from the stock options should have been considered as part of the alimony award.  Although income from assets is a statutory consideration, N.J.S.A. 2A:34-23(b)(10) and (11), the options plaintiff acquired were worth one penny each and did not increase in value.

We reject defendant's claims regarding the income imputation. "Imputation of income is a discretionary matter not capable of precise or exact determination[,] but rather require[es] a trial judge to realistically appraise capacity to earn and job availability." Elrom v. Elrom, 439 N.J. Super. 424, 434 (App. Div. 2015) (alterations in original) (quoting Gnall, 432 N.J. Super. at 158).  In Elrom, we noted the authority to impute income

> is incorporated in the New Jersey Child Support Guidelines (Guidelines).  See R. 5:6A (adopting Guidelines set forth in Appendix IX-A to the Court Rules).  The Guidelines state:
>
> > [i]f the court finds that either parent is, without just cause, voluntarily underemployed or unemployed, it shall impute income to that parent according to the following priorities:

a. impute income based on potential employment and earning capacity using the parent's work history, occupational qualifications, educational background, and prevailing job opportunities in the region. The court may impute income based on the parent's former income at that person's usual or former occupation or the average earnings for that occupation as reported by the New Jersey Department of Labor (NJDOL);

b. if potential earnings cannot be determined, impute income based on the parent's most recent wage or benefit record[.]

[Id. at 435 (first alteration in original) (quoting Child Support Guidelines, Pressler & Verniero, Current N.J. Court Rules, comment 12 on Appendix IX-A to R. 5:6A at 2635 (2015)).]

Furthermore,

[c]onsiderations involving children must be weighed when imputing income. . . . [T]he Guidelines discuss the need to account for young children's needs when imputing income to [a] parent . . . stating:

In determining whether income should be imputed to a parent and the amount of such income, the court should

23

consider: (1) what the employment status and earning capacity of that parent would have been if the family had remained intact or would have formed, (2) the reason and intent for the voluntary underemployment or unemployment, (3) the availability of other assets that may be used to pay support, and (4) the ages of any children in the parent's household and child-care alternatives. . . . When imputing income to a parent who is caring for young children, the parent's income share of child-care costs necessary to allow that person to work outside the home shall be deducted from the imputed income.

[Pressler & Verniero, comment 12 on Appendix IX-A to R. 5:6A at 2635.]

On this issue, the Supreme Court has "noted that '[t]he key to both the [G]uidelines and the statutory factors is flexibility and the best interest of children.'" The importance of addressing a child's needs because of health or tender years may dictate the proximity of parental employment.

[Id. at 439-40 (last three alterations in original) (citations omitted).]

This imputation rubric applies equally to alimony.  Id. at 435-36.

The record amply supports the income imputation.  Defendant's earning history demonstrated she earned approximately $35,000 per year in 1998 and 1999, as a cosmetologist.  Also, in light of the college education defendant already possessed, and her enrollment in Monmouth University, the judge

considered the United States Bureau of Labor Statistics median wage for a college graduate with a bachelor's of arts degree, which was $59,124 per year. However, exercising her discretion, and considering defendant's absence from the labor market, the judge imputed an income of half the amount, a figure less than what defendant previously earned. Moreover, the judge noted defendant could return to work on a full-time basis because both children attended school during the day. For these reasons, we are satisfied the income imputation was based on the credible evidence in the record.

Defendant argues that the court erred in downwardly adjusting the marital lifestyle from the actual sums expended during the marriage. The standard of living during the marriage serves as the "touchstone" for alimony. Crews, 164 N.J. at 16. Whenever possible, the alimony award should be set at an amount that will "enable each party to live a lifestyle 'reasonably comparable' to the marital standard of living." Id. at 26 (citing N.J.S.A. 2A:34-23(b)(4)).

In Hughes v. Hughes, 311 N.J. Super. 15, 34 (App. Div. 1998), we reversed a trial court's finding which artificially lowered a family's standard of living to exclude the portion of the lifestyle financed by debt. We stated:

> As to the question of the standard set during the marriage, the judge distinguished between the standard at which the parties actually lived and that which he determined they should have lived, what he called the

"real" standard of living, without resort to excessive borrowing. The judge here confused two concepts. The standard of living during the marriage is the way the couple actually lived, whether they resorted to borrowing and parental support, or if they limited themselves to their earned income.

[Ibid.]

Here, the judge noted the joint marital lifestyle, expressed on a monthly basis in each party's CIS, namely, $12,004 for plaintiff and $13,564 for defendant. However, the judge's decision "adjusted" the expenses. In analyzing plaintiff's representation of the joint marital lifestyle, the judge reduced the schedule C expenses listed as "other" by $1518 and concluded "these expenses are unexplained; rider is not attached[.]" Thus, the judge concluded the joint marital expenses were $10,486 per month and the monthly deficit, based on plaintiff's net income of $9100 per month, was $1386.

Defendant's CIS projected a joint marital budget of $13,564 per month. The trial judge adjusted defendant's schedule A budget upwards because it understated the mortgage. The judge deducted $969 from defendant's schedule C budget for various items and stated "[t]he [c]ourt [finds] these expenses to be excessive[.]" Thus, the judge concluded the joint marital lifestyle pursuant to the defendant's CIS was $12,595 per month.

The judge concluded:

Based on the above analysis, the parties were living above their means since plaintiff was the only party working and both parties agree that the joint marital lifestyle exceeded $12,000[] net per month. After this [c]ourt adjusted both parties' expenses downward, their joint marital lifestyle expenses remain at least $10,500[], which exceeded plaintiff's net monthly income of approximately $9100[] per month by at least $1400[], and even more so if this [c]ourt were to accredit defendant's CIS. This [c]ourt, however, does not accredit defendant's CIS as it is excessive. But the point remains, the parties' expenses exceeded plaintiff's income.

The judge concluded "[t]he standard of living established by the parties was approximately $11,000[] per month[.]"

Pursuant to Hughes, we agree with defendant the judge could not "adjust" the marital lifestyle on account of its excesses. However, considering the judge's conclusion that defendant lacked credibility altogether, this error was harmless and not "clearly capable of producing an unjust result." R. 2:10-2. The judge clearly based the finding of the marital standard of living on plaintiff's CIS, which she found credible. The adjustments she made to his projection of the lifestyle were not on account of excess, but for a lack of evidence to corroborate a segment of the schedule C expenses. For these reasons the judge's findings regarding lifestyle were not reversible error.

27

Defendant argues the trial judge's alimony determination utilized the incorrect tax rate. Specifically, the judge used a seven percent tax rate, which defendant asserts yielded a higher net income than the sum she would realize if her actual tax rate had been applied. We agree.

The trial judge did not explain how she derived the seven percent tax rate, and we can find no support for its use in the record. Moreover, the tax rate utilized in the child support guidelines projected defendant's tax rate to be fourteen percent. For these reasons, we are constrained to remand this aspect of the alimony determination for further consideration by the trial judge.

Defendant also argues the judge also did not explain how she determined a housing expense of $2000 per month for each party. The judge's decision allotted each party this sum as a shelter expense, but gave no reasons for doing so, and the record lacked evidence to support the expense. For these reasons, we remand this aspect of the alimony determination for further findings. R. 1:7-4(a).

Defendant argues the trial judge's analysis of her needs was erroneous. She argues the judge's deduction of certain expenses for her car, vacations, professional, educational, food, and household supplies was reversible error. We are unpersuaded.

A-1751-16T2

As we noted, defendant failed to file an updated CIS. Moreover, the judge noted her CIS was incomplete. Defendant's CIS asserted her current needs were $11,902 per month. This figure exceeded the joint marital lifestyle, and did not include plaintiff's share of the expenses and the fact defendant did not have the children for fifty percent of the time. The judge reduced defendant's budget to $7534 per month, which exceeded her finding plaintiff's monthly needs were $6656. The judge noted defendant's auto loan payment was overstated and the schedule C expenses were adjusted because there was "no support . . . provided to the [c]ourt." The judge reduced expenses for items on defendant's CIS that were "excessive" and/or "no support" for them was provided. For these reasons, the judge's findings were not an abuse of discretion.

Defendant argues the court left plaintiff with a budgetary surplus of $1320 per month and did not explain why she did not allocate the sum between the parties. We reject this argument because an alimony award does not mandate an income equalization. Moreover, the judge imposed the majority of the responsibility for the children's extracurricular expenses and special classes for the parties' elder daughter, including "Hippotherapy, social skills classes, computer camp, and speech therapy," on plaintiff. Thus, we find no error in this aspect of the judge's determination.

A-1751-16T2

## C.

Defendant challenges the child support award and argues the judge's guideline calculation included the wrong figure in the alimony line item and incorrectly calculated the taxes. She argues the judgment's imposition of a requirement that she submit the children's extracurricular expenses to plaintiff for reimbursement, or otherwise waive a reimbursement, was tantamount to an illegal waiver of child support.

The judgment requires plaintiff to pay child support at a rate of thirty-nine dollars per week, utilizing a shared parenting worksheet. The guidelines attributed alimony of $645 per week to defendant, where the judge had ordered it payable at a rate of $600. The judge utilized a seven percent tax rate, as we previously noted, in arriving at the $645 figure, reasoning she had to utilize a greater figure to account for the taxability of alimony.

The child support calculation was erroneous because the guidelines consider taxes on income from all sources, including alimony and deduct taxes in accordance with the recipient's total adjusted gross income. See Use of the Child Support Guidelines, Pressler & Verniero, Current N.J. Court Rules, Appendix IX-B to R. 5:6A, lines 1c, 2 and 2a, www.gannlaw.com (2018). For these reasons, we reverse and remand the child support award for a recalculation.

Given the difficult history of this case and the adversarial nature of the parties' interactions, we find no error in the trial judge's imposition of a system to assure the reimbursement of the children's extracurricular activity expenses. The reimbursement mechanism established by the judge incentivizes defendant to cooperate with plaintiff by denying her a reimbursement if she fails to submit receipts and proof of payment for the children's activities. This does not equate with a child support waiver because plaintiff could continue to fund the children's expense, and seek enforcement of defendant's share of the obligation through the entry of a judgment or adjustment of alimony or child support in the event she failed to cooperate. See Rule 5:3-7(b)(1), (2), and (8).

D.

Defendant challenges the equitable distribution award. She asserts: the credit card debt was discharged in bankruptcy, therefore plaintiff should not have been awarded equitable distribution to enable him to satisfy his responsibility for the debt; the judge should have ordered an equitable distribution of stock options awarded to plaintiff one year after the filing of the complaint for divorce; the judge failed to consider her argument that plaintiff's failure to apply for Hurricane Sandy funds to repair the former marital residence was a form of dissipation; the judge erred when she determined defendant had

dissipated the marital estate by sending money to her family; and the judge erred by ordering the sale of the marital residence.

> "[T]he goal of equitable distribution . . . is to effect a fair and just division of marital [property]." Steneken v. Steneken, 183 N.J. 290, 299 (2005) (quoting Steneken v. Steneken, 367 N.J. Super. 427, 434 (App. Div. 2004)). After a trial judge identifies the marital assets and determines the value of each asset, the judge must decide "how such allocation can most equitably be made." Rothman v. Rothman, 65 N.J. 219, 232 (1974). This demands more than simply "mechanical division[,]" it requires a "weighing of the many considerations and circumstances . . . presented in each case." Stout v. Stout, 155 N.J. Super. 196, 205 (App. Div. 1977), overruled on other grounds by Petersen v. Petersen, 85 N.J. 638, 643, n.2 (1981). This is because equitable distribution "reflects a public policy that is 'at least in part an acknowledgment that marriage is a shared enterprise, a joint undertaking, that in many ways [] is akin to a partnership.'" Thieme v. Aucoin-Thieme, 227 N.J. 269, 284 (2016) (quoting Smith v. Smith, 72 N.J. 350, 361 (1977) (quoting Rothman, 65 N.J. at 229)).
>
> However, an equitable distribution does not presume an equal distribution. See Rothman, 65 N.J. at 232 n.6. Rather, N.J.S.A. 2A:34-23.1, requires an equitable distribution be "designed to advance the policy of promoting equity and fair dealing between divorcing spouses." Barr v. Barr, 418 N.J. Super. 18, 45 (App. Div. 2011). This policy is best implemented by evaluating the facts and evidence associated with each asset.
>
> [M.G. v. S.M., __ N.J. Super. __, __ (App. Div. 2018 (slip. op. at 9-10) (alterations in original).]

32                                                                     A-1751-16T2

Pursuant to these principles, and having considered the judge's decision and the record, we are convinced the challenges raised to the equitable distribution lack merit and do not warrant further discussion. R. 2:11-3(e)(1)(E).

E.

Defendant challenges the judge's award of an IRA and a small bank account to plaintiff to satisfy counsel fees. Specifically, she claims the judge undervalued the IRA by assuming a hypothetical tax obligation for liquidation of the account and awarding its entirety to plaintiff. Defendant asserts the judge could not award counsel fees to plaintiff for his attorney's efforts in the bankruptcy matter. She also argues the judge should have undertaken an independent analysis of counsel fees, which another judge pendente lite had found defendant should pay plaintiff. Defendant claims the judge should have awarded her counsel fees.

Rule 5:3-5(c) lists nine factors the court must consider in making an award of counsel fees in a family action. Essentially,

> in awarding counsel fees, the court must consider whether the party requesting the fees is in financial need; whether the party against whom the fees are sought has the ability to pay; the good or bad faith of either party in pursuing or defending the action; the nature and extent of the services rendered; and the reasonableness of the fees.

[Mani v. Mani, 183 N.J. 70, 94-95 (2005) (emphasis omitted) (citing Williams v. Willaims, 59 N.J. 229, 233 (1971)).]

An award "of counsel fees is discretionary, and will not be reversed except upon a showing of an abuse of discretion." Barr, 418 N.J. Super. at 46 (citing Packard-Bamberger & Co., v. Collier, 167 N.J. 427, 444 (2001)).

We conclude there is ample evidence in the record to support the trial judge's award of counsel fees to plaintiff, as opposed to defendant. The judge's opinion explained in detail how defendant acted in bad faith by dissipating assets, pursuing unreasonable pendente lite applications, and involving the Division through reports of alleged child abuse or neglect. The judge further explained how defendant delayed the litigation by discharging multiple attorneys, including during the trial, and filing for bankruptcy.

Plaintiff's IRA was valued at $93,834. We find no error in the trial judge's valuation, which reduced its value by twenty-six percent to account for a ten percent liquidation penalty and a sixteen percent tax. This calculation was not hypothetical because, as plaintiff's counsel confirmed during oral argument, plaintiff would need to liquidate the asset in order to pay his counsel fees, which totaled more than $140,000, excluding this appeal.

Furthermore, we find no error in the award of $5429 in counsel fees to plaintiff related to the bankruptcy litigation because those fees were incurred to preserve marital assets, namely, the former marital residence and Sandy-related insurance proceeds. Additionally, the trial judge's award of $2108, relating to a pendente lite motion argued before a motion judge in May 2012, was not erroneous. The motion judge's order had preserved plaintiff's right to seek counsel fees at a final hearing for the successful defense of a pendente lite motion filed by defendant. The trial judge's award of $2108 in counsel fees for this motion was not erroneous because the record demonstrates plaintiff incurred $5790 in counsel fees during the months of April and May 2012 to defend the motion.

### F.

Finally, defendant challenges the trial judge's findings on credibility. In addition to the deference we owe to a trial judge's credibility findings, we add that defendant's arguments in this regard lack merit because the record simply does not support the suggestion the judge's credibility findings were erroneous.

To the extent we have not addressed an argument raised by defendant in this appeal it is because it is without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

A-1751-16T2

Affirmed in part, reversed and remanded in part for further proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1751-16T2