869 A.2d 435 (2005)
376 N.J. Super. 99
W. Bruce OVERBAY, Plaintiff-Respondent/Cross-Appellant,
v.
Mary Ellen OVERBAY, Defendant-Appellant/Cross-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued October 26, 2004.
Decided March 18, 2005.
*436 Bonnie C. Frost, Denville, argued the cause for appellant/cross-respondent (Einhorn, Harris, Ascher, Barbarito, Frost & Ironson, attorneys; Ms. Frost on the brief).
William C. Dodd, Morristown, argued the cause for respondent/cross-appellant (Schenck, Price, Smith & King, attorneys; Mr. Dodd, on the brief).
Before Judges COBURN, WECKER and GRAVES.
The opinion of the court was delivered by
GRAVES, J.A.D.
Both parties appeal from a Dual Judgment of Divorce and a subsequent order denying cross-motions for reconsideration, claiming the trial court erred in awarding defendant alimony in the amount of $3,000 per month. Defendant, Mary Ellen Overbay, contends that the trial court misapplied Miller v. Miller, 160 N.J. 408, 734 A.2d 752 (1999), when it imputed income to her in the amount of $80,000 per year by attributing a 7.4 percent rate of return on inheritance assets. Because we are convinced this argument has merit, we reverse and remand to the Family Part for *437 reconsideration and redetermination of alimony.
After being married for more than thirty-one years, and raising three children, the parties were divorced on September 17, 2002. Plaintiff, W. Bruce Overbay is now sixty-one years old, and defendant will be fifty-eight years old this month. The three children all successfully completed college and were emancipated at the time of the divorce.
Following a five-day trial, the court set forth its findings in a letter opinion dated August 12, 2002. The court concluded that during the marriage the parties enjoyed "a comfortable lifestyle which can be reasonably maintained." During most of the marriage the parties lived in an attractive Colonial style home, with a living area of approximately 3,700 square feet, a fair market value of $807,500, and a net equity of approximately $722,500 at the time of trial. Both parties received an M.B.A. degree from Wharton School of Business. As agreed to by the parties, defendant gave up her career at Citibank early in the marriage to become a full-time homemaker and mother, while plaintiff functioned as the father and full-time wage earner.
At the time of trial, plaintiff was in good health earning $132,000 per annum plus a significant benefits package as a result of his employment at ExxonMobile, which began shortly after the parties were married. The trial court found "[t]here is no reason to believe that his employment [in a managerial position] will not continue. He has in the past been receiving an increase equal to about 2.68% on the average over the last ten years."
Defendant, on the other hand, is not in good health. The trial judge found she has "serious health problems, suffering primarily from heart problems [that] resulted in two prior hospitalizations." Defendant taught two classes at Seton Hall University, earning $12,000 annually and, given her "significant medical problems," the court stated "[h]er future employability is uncertain."
The trial judge's resolution of the major issues can be summarized as follows:
1. Plaintiff was ordered to pay alimony to defendant in the amount of $3,000 per month.
2. The marital residence was to be sold with the net proceeds of sale equally divided between the parties; however, in a subsequent consent order, defendant purchased plaintiff's interest in the marital home for $340,000.
3. Plaintiff's pension with ExxonMobile attributable to employment during the marriage, until the filing of the complaint for divorce, was equally divided.
4. The balance in plaintiff's savings plan account with ExxonMobil was equally divided as of the date the divorce complaint was filed.
5. The parties were equally responsible for repaying two ExxonMobil savings plan loans and a Visa credit card debt.
6. Each party was responsible for payment of his or her own counsel fees.
The parties submitted written summations to the trial judge, and plaintiff argued that defendant should receive alimony in the amount of $1,412 per month based on the following calculations:
Since Plaintiff's annual disposable income is $132,000 and Defendant's annual income from her employment is $12,000 and her imputed income from her investments is $86,120, the Court should equalize these incomes through an annual alimony payment from Plaintiff to Defendant of $16,940, or $1,412 per month so that each of the parties will have the same gross annual income, $115,060, *438 with which to defray their living expenses.
On the other hand, defendant argued that alimony in the amount of $6,000 per month was "feasible and necessary," reasoning as follows:
The Court can clearly see that even with drastic cuts to the Defendant's budget on her housing expenses, her transportation expenses and any discretionary expenses on Schedule C, that there is still a huge chasm between what the Defendant will need to survive in the future and what is available to her from all sources. Even with an award of $6,000.00 per month alimony the Defendant will be forced to deplete capital in order to survive on a greatly diminished budget. Accordingly it is submitted that the Court should as a finding of fact determine that the amount of alimony to be paid by the Plaintiff to the Defendant at $6,000.00 per month is a number which the Plaintiff can afford and should be required to pay as part of the resolution of this case.
Alimony was and is a central issue in this case. In assessing defendant's need for alimony, the court considered various monetary gifts and inheritances defendant received during the marriage from family members, including her mother and her aunts, commencing in 1981. These assets, referred to as defendant's inheritance throughout the trial, were valued at $1,143,695 as of May 2, 2002. Plaintiff stipulated these assets were not subject to equitable distribution, N.J.S.A. 2A:34-23(h), but the income generated from defendant's inheritance was a crucial factor in assessing defendant's need for alimony, N.J.S.A. 2A:34-23(b)(11). See also Aronson v. Aronson, 245 N.J.Super. 354, 363, 585 A.2d 956 (App.Div.1991) (Although inheritance is exempt from equitable distribution, income generated by a dependent spouse's inheritance "is no different from income generated by any other asset, exempt or otherwise, for an alimony analysis.").
Each party presented testimony from a certified financial planner regarding defendant's inheritance assets. This testimony established that approximately eighty-six percent of defendant's total inheritance was invested in cash or cash equivalents, nine percent was invested in bonds or fixed income securities, and about five percent was invested in stocks or managed equities. Defendant's inheritance was classified as a "low-risk portfolio," and the experts agreed that low-risk investments generally translate into a low rate of return, and, conversely, higher risk investments usually provide a higher rate of return. The trial judge found that defendant's rate of return was "approximately two percent."
In assessing defendant's need for alimony, the judge concluded that defendant's reasonable expenses amounted to $8,000 a month, or $96,000 per year, and he made the following determinations:
In order to obtain this amount, the defendant would have to have a gross income of approximately $128,000 a year. To achieve that total the defendant should receive approximately $80,000 a year from her assets, $12,000 from her employment and $36,000 in alimony. The defendant in her letter memorandum suggests that a tax reserve amounting to 25% be set aside. Taking 25% from $128,000 amounts to $32,000, which would leave the defendant with $96,000 per annum or $8,000 per month.
Citing to Miller v. Miller, 160 N.J. 408, 734 A.2d 752 (1999), the trial judge imputed an annual income of $80,000 to defendant based upon a 7.4 percent rate of return on her inheritance assets. The trial judge explained his decision to impute additional *439 investment income to defendant as follows:
It is because of the potential for extreme volatility in the stock market that the Court in Miller determined that the fairest and most appropriate measure for imputing income would be to take a five-year average yield for long-term A-rated corporate bonds as determined by Moody's [Composite Index]. That yield is 7.4%. The other assets will not produce any significant income. In order to achieve an income of $80,000 per annum, the entire inheritance except for $60,000 would be subject to investment with an imputed yield of 7.4%. I find that in the short term defendant might have immediate use for some cash and therefore $60,000 should be excluded from the total inheritance.
Although the precise reason for excluding $60,000 from defendant's inheritance went unstated, we presume this was attributable to the trial judge's determination that both parties would pay their own counsel fees. Thus, the court imputed investment income to defendant in the amount of $80,000 per year, calculated as follows: $1,143,695  $60,000 = $1,083,695 x 7.4% = $80,193. This, of course, substantially reduced defendant's need for alimony, and in a motion for reconsideration, defendant certified it was not possible for her to actually earn $80,000 per year from her inheritance and any attempt to do so would risk capital "in a completely unacceptable fashion." Defendant argued: "corporate bonds in today's climate are not only a high risk but also foreign to the investments which were made by the plaintiff and myself during the marriage.... The court need only reference the debacle with Enron, WorldCom and Global Crossing."[1]
"[T]he goal of a proper alimony award is to assist the supported spouse in achieving a lifestyle that is reasonably comparable to the one enjoyed while living with the supporting spouse during the marriage." Crews v. Crews, 164 N.J. 11, 16, 751 A.2d 524 (2000). Accord Innes v. Innes, 117 N.J. 496, 503, 569 A.2d 770 (1990); Mahoney v. Mahoney, 91 N.J. 488, 501-02, 453 A.2d 527 (1982); Lepis v. Lepis, 83 N.J. 139, 150, 416 A.2d 45 (1980); Khalaf v. Khalaf, 58 N.J. 63, 69, 275 A.2d 132 (1971). Trial courts may award such alimony "as the circumstances of the parties and the nature of the case shall render fit, reasonable and just." N.J.S.A. 2A:34-23. Accordingly, "courts possess the equitable power to set alimony at the time of a divorce, and to monitor and revise alimony on an ongoing basis, as circumstances may require." Weishaus v. Weishaus, 180 N.J. 131, 140, 849 A.2d 171 (2004) (citations omitted).
Generally, "appellate courts should accord deference to family court *440 factfinding." Cesare v. Cesare, 154 N.J. 394, 413, 713 A.2d 390 (1998). When reviewing an alimony award, we must give deference to a trial judge's findings "if those findings are supported by substantial credible evidence in the record as a whole." Cox v. Cox, 335 N.J.Super. 465, 473, 762 A.2d 1040 (App.Div.2000) (quoting Reid v. Reid, 310 N.J.Super. 12, 22, 708 A.2d 74 (App.Div.), certif. denied, 154 N.J. 608, 713 A.2d 499 (1998)). "A trial judge's decision to impute income of a specified amount will not be overturned unless the underlying findings are inconsistent with or unsupported by competent evidence." Storey v. Storey, 373 N.J.Super. 464, 474-75, 862 A.2d 551 (App.Div.2004) (citations omitted).
The issue in Miller was "whether income should be imputed from a supporting spouse's investments for the purpose of determining his or her ability to pay alimony pursuant to an agreement." Miller v. Miller, supra, 160 N.J. at 413, 734 A.2d 752. Mr. Miller, "an experienced investor who gained great knowledge of financial matters through his employment at Merill Lynch," id. at 425, 734 A.2d 752, "had $1.5 million invested in Municipal Bonds, yielding a tax-free income of $87,500 per year," and he "had invested approximately $3,000,000 in various growth stocks, paying interest and dividends of approximately $50,000 per year," id. at 416, 734 A.2d 752. Mrs. Miller argued the "potential, although yet unrealized, income from [her former husband's] investments should be imputed to [him] in much the same way as income earned through employment is imputed to an unemployed or underemployed supporting spouse." Id. at 421-22, 734 A.2d 752 (citations omitted). The Court agreed, but declined to impute the average annual twelve percent growth rate for stocks "because of the inherent risks involved in stock market investments." Id. at 423-25, 734 A.2d 752. Instead, the Court took a more conservative approach imputing only 7.7 percent to Mr. Miller's investments. Id. at 425, 734 A.2d 752. Thus, if Mr. Miller had voluntarily elected to follow the alternative investment practice outlined by the Court, he would have achieved a higher rate of return on his investments without exposing his capital to greater risk simply by investing differently:
[P]laintiff, as the supporting spouse, could invest his substantial capital assets to yield more than the approximately 1.6 percent interest he is currently earning on his growth stock investments. Doing so would not require that [Mr. Miller] deplete his considerable principal; it only means that [he] could invest his principal differently in higher yield investment options available to him, much in the same way that an underemployed spouse could obtain a higher paying job available to him to make a more productive use of his human capital.
[Id. at 423, 734 A.2d 752.]
The Court concluded that imputing income to Mr. Miller's investments based upon the five-year average rate of return for Moody's Composite Index on A-rated Corporate Bonds was "the fairest solution ... under the present circumstances." Id. at 424-25, 734 A.2d 752. The Court then limited its holding as follows:
We emphasize that our holding today does not suggest that [Mr. Miller] must actually invest all of his substantial assets in choice long-term corporate bonds. To the contrary, we recognize that [Mr. Miller] is an experienced investor who gained great knowledge of financial matters through his employment at Merrill Lynch. He may choose to diversify his investment portfolio over many different types of investment options. We do not intend to deprive [Mr. *441 Miller] of the opportunity to control his investment options.

[Id. at 425-26, 734 A.2d 752 (emphasis added).]
Unfortunately, by rigidly applying the formula used in Miller to the facts of this case, the trial court effectively deprived Mrs. Overbay of the opportunity to control her investment options. Because the trial court determined that Mrs. Overbay's reasonable needs were $96,000 per year, and because it imputed investment income to her in the amount of $80,000 per year, she will be forced to pursue a more aggressive investment strategy that will subject her capital to greater risk. If she fails to do so, her income will be insufficient to meet her reasonable needs.
In our view, what was reasonable for Mr. Miller is not reasonable for Mrs. Overbay. Mr. Miller, an experienced investor with a net worth of $6,561,644 and a high tolerance for risk, pursued an aggressive investment strategy. On the other hand, Mrs. Overbay testified that it was always very important to her "to maintain the principal and not let anything happen to it. So I've tried to invest it safely where there would always be a rate of return, but a safe rate of return." When asked why it was important for her to maintain the principal and not put her inheritance at risk, she testified that her inheritance was "hard earned money," and she did not know "what my health expenses might be or what the future holds and that's what that was there for. I inherited bad genes and money."
The trial judge did not refer to the testimony from the two financial planners, except to acknowledge that defendant's expert, Mr. Donovan, testified that if he were advising the defendant he would not recommend that she invest in long-term A-rated corporate bonds. Mr. Donovan also testified that the corporate bond market was negatively affected by the Enron and WorldCom scandals and he did not "know of any investments today that would be of the same quality as an A-rated bond that would be paying a 7.4 percent yield." In addition, Mr. Donovan explained that long-term corporate bonds were not a suitable investment for defendant because long-term bonds must be held to maturity to avoid fluctuations in the value of the bond. (There is an inverse relationship between interest rates and bond prices. As interest rates increase, the price for an existing bond tends to decrease, and as interest rates decrease, the price for an existing bond tends to increase.) This testimony was not disputed by plaintiff or his expert, and the record does not reflect why the trial judge rejected it.
We know from common knowledge and experience that even sophisticated professional investors do not always succeed in preserving their capital when they invest in stocks and bonds. Given the volatility of the stock market and the unpredictability of potential income from investments, the amount of money defendant can realistically expect to generate from investing her inheritance in low-risk investments is by no means certain. "Recent times have underscored the difficulty of predicting a yield on investments, and the challenges of relying on the stock market as a supplement to support.... Even cautious investors would not have anticipated that investments in companies like Enron or WorldCom could evaporate over night." Turner v. Turner, 147 Md.App. 350, 809 A.2d 18, 44 (2002). As noted by defendant's expert, for someone like Mrs. Overbay, who is not willing to expose her inheritance to moderate or high-risk investments, "the investment universe for cash/cash equivalents is somewhat limited"; however, such investments do exist. As noted by the trial *442 judge, for example, "10 year Treasury Notes have yielded 4.46% over the last five years."
We have previously indicated the need to utilize some reasonable foundation or basis when imputing income to an inheritance. Connell v. Connell, 313 N.J.Super. 426, 434, 712 A.2d 1266 (App.Div.1998). In addition, we have cautioned that "[t]he peculiar facts of each case must be carefully weighed to achieve fairness and balance in considering a [spouse's] inheritance." Ibid. The trial judge's application of these principles in this case was flawed. The record does not reflect to what extent, if at all, the trial judge took into account the testimony provided by defendant's financial planner, defendant's age, her serious health problems, her limited employment income, her aversion to risk and her stated desire to preserve capital, the manner in which her inheritance had been invested during the marriage and its historical rate of return, or the availability of appropriate alternative investment options.
Defendant now argues that the trial court erred in applying the Miller rationale "in a lock step manner" to reduce her need for alimony. The record confirms that the trial judge felt he was bound by the Miller analysis. At one point, he advised counsel that he wanted to "pretty much stick to the criteria in the ... Miller case in terms of how we're supposed to look at these matters." At another point, he stated:
Now, I indicated I'm bound as a trial court by the Supreme Court, but I'm going to read it very carefully because without looking at it more recently I don't know how much flexibility I have. Clearly, I think that I have to take into account the present market conditions. By the same token, I think that even though this  the Miller case was decided before the stock market really took a tumble and we find ourselves in this mess that we have right now. The Court might have foreseen some volatility by the mere fact that they chose in their decision to use a five-year average which means, of course that, you know, you can have a bad year and things can abruptly change and get better. That's why we use averages.
The decision in Miller to impute a 7.7 percent rate of return based on long-term A-rated corporate bonds was predicated on the specific facts and circumstances in that case. Miller, supra, 160 N.J. at 424-25, 734 A.2d 752. There is no reason to believe that the Court intended to establish a universal rule to be replicated in every case thereafter. On the contrary, because "no two cases are exactly alike," Bonanno v. Bonanno, 4 N.J. 268, 274, 72 A.2d 318 (1950), neither bright-line tests nor hard and fast rules should be imposed when imputing a reasonable rate of return any more than when determining an appropriate award of alimony. See, e.g., N.J.S.A. 2A:34-23(b)(13) (requiring court to consider, in addition to twelve enumerated factors, "[a]ny other factors which the court may deem relevant"); Kingsdorf v. Kingsdorf, 351 N.J.Super. 144, 157, 797 A.2d 206 (App.Div.2002) ("[A] court of equity should not permit a rigid principle of law to smother the factual realities to which it is sought to be applied." (quoting Graziano v. Grant, 326 N.J.Super. 328, 342, 741 A.2d 156 (App.Div.1999))); Habble v. Habble, 99 N.J. Eq. 53, 56, 132 A. 113 (Ch.1926) (A particular method for determining alimony "is only a guide, and not a hard and fast rule. Each case must be separately judged according to the circumstances."). See also Alston v. Alston, 331 Md. 496, 629 A.2d 70, 75 (1993) ("[N]o hard and fast rule can be laid down, and ... each case must depend upon its own circumstances to insure that equity be *443 accomplished."); Tracey v. Tracey, 328 Md. 380, 614 A.2d 590, 597 (1992) ("[E]quity requires sensitivity to the merits of each individual case without the imposition of bright-line tests.").
The lesson to be learned from Miller is that when a spouse with underearning investments has the ability to generate additional earnings  without risk of loss or depletion of principal  but fails to do so, it is fair for a court to impute a more reasonable rate of return to the underearning assets, comparable to a prudent use of investment capital. In Miller, the Court took note of the difference between legitimate investment strategies, specifically, between investing "designed to produce [future] income through appreciation in stock values" and investing for present income. Miller, supra, 160 N.J. at 421, 734 A.2d 752. In imputing additional income to Mr. Miller, id. at 423-24, 734 A.2d 752, the Court recognized that it would be unfair to allow one spouse to maximize future income through anticipated asset appreciation for his or her own benefit, while limiting present income that would enter into the alimony calculation for the benefit of the other spouse. That distinction between a "growth" strategy and an "income" strategy applies equally to a supporting and a supported spouse in the context of imputing income to either spouse for purposes of calculating alimony. Mrs. Overbay's investment strategy here bears no similarity to Mr. Miller's. There is no suggestion that she has reduced her current income in the pursuit of future asset appreciation. Thus, the trial judge initially erred when he failed to explain why it was appropriate to impute additional earnings to defendant's inheritance, and he subsequently erred when he used an unrealistic rate of return to impute additional investment income to defendant.
During the trial, defendant claimed that she had engaged in appropriate investment practices throughout the marriage; however, even if this were so, the court must still consider "[t]he income available to either party through investment of any assets held by that party." N.J.S.A. 2A:34-23(b)(11). Thus, on remand, the trial court must first decide whether it is appropriate to impute additional earnings from defendant's inheritance "comparable to a prudent use of [her] investments." Miller, supra, 160 N.J. at 424, 734 A.2d 752. If additional earnings are to be imputed, the court must then determine the reasonable amount of additional income to be attributed to defendant. See Caplan v. Caplan, 182 N.J. 250, 270, 864 A.2d 1108 (2005) ("Once the trial court decides that income should be imputed, the next step is to determine the reasonable amount of income to be imputed to that party.").[2]
If the trial court determines that defendant's investments provide a prudent balance between investment risk and investment return, then additional income should not be imputed even though a more aggressive investment strategy might provide additional earnings. Defendant is not required to put her capital at risk, or to jeopardize her inheritance, by pursuing an investment strategy that is neither reasonable nor prudent. See, e.g., Lake v. Lake, 756 A.2d 917, 924 (D.C.2000) (concluding that "a conservative five percent could reasonably *444 be imputed as annual investment income" without requiring "invasion into principal or increased future earnings"); Brock v. Brock, 690 So.2d 737, 741 (Fla.Dist.Ct.App.1997) (noting that it is not equitable "to require an investor to reinvest assets in a manner which will result in losses through fees, taxes, cost, and loss of principal due to inflation" because "[s]uch an investment strategy is not ... `prudent'"); Breihan v. Breihan, 73 S.W.3d 771, 778 (Mo.Ct.App.2002) (Former spouse "should not be required to risk assets in order to generate higher rates of return nor should the court impute a greater amount of income based on more aggressive investments." (citation omitted)).
Each of the parties raised other issues that are relevant to the alimony determination. For example, plaintiff claims the trial court erred by overstating plaintiff's ability to pay alimony ("the error here is in the trial court's calculation of approximately $3,000 more in available net wages to plaintiff"), and plaintiff also claims the trial court erred "in allowing defendant $2,000 more in available income per month than plaintiff without justification." On the other hand, defendant contends "the court erred in ordering only $3,000 a month in alimony because it did not include all the plaintiff's earnings in his income [and] it capriciously slashed defendant's budget." Because this case must be remanded for further trial proceedings, we decline to address these additional alimony arguments. On remand, the trial judge must consider all relevant facts and circumstances, including these arguments, when redetermining the appropriate amount of permanent alimony to be paid by plaintiff to defendant. We do not intend to suggest the outcome of any of the disputed financial issues, but only to insure that all of the appropriate facts and circumstances are fully considered and evaluated by the trial judge.
Defendant also claims the trial court erred in distributing marital assets and in allocating marital debts, and plaintiff contends that the court erred in allowing defendant to pay her half share of the savings plan loans, about $14,000, by set off against her share of the savings plan balance. After considering the statutory factors, N.J.S.A. 2A:34-23.1, in light of the evidence, the trial judge determined there was "no basis for anything other than a fifty-fifty split of assets." As to the outstanding marital debts, the court stated:
The first mortgage on the marital home will be satisfied from the closing proceeds unless the defendant purchases the property in which case she will be responsible for payment of the mortgage. As to the balance of debt from the 401K Plan, the Visa bill as well as the roofing expense, this entire debt will be equally shared by the parties. The amounts taken by each party are close enough so that the parties should share these obligations equally.
We affirm as to these issues because we conclude the trial judge's findings and conclusions are adequately supported by the evidence. R. 2:11-3(e)(1)(A).
Accordingly, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion. On remand, the parties should be afforded an opportunity to supplement the record with additional relevant testimony and evidence. We do not retain jurisdiction.
NOTES
[1] See James D. Cox, Reforming the Culture of Financial Reporting: The PCAOB and the Metrics for Accounting Measurements, 81 Wash. U. L.Q. 301 (2003) ("Thanks to the financial frauds that are being revealed by Enron, Global Crossing, WorldCom, Tyco and the like, hiding money in the mattress rather than investing it in the market is a more credible choice these days than it was in the 1990's."); Steven A. Ramirez, Fear and Social Capitalism: The Law and Macroeconomics of Investor Confidence, 42 Washburn L.J. 31, 55-56 (noting that collapse of Enron in late 2001, failure of Global Crossing shortly thereafter, and "the nation's largest bankruptcy ever" filed by WorldCom in early 2002 all "took a terrible toll on investor confidence.... By mid-summer [2002], the market wobble had become a market rout."). See generally William S. Lerach, Plundering America: How American Investors Got Taken for Trillions by Corporate Insiders, 8 Stan J.L. Bus. & Fin. 69 (2002) (answering questions "How Did We Get Here," "What Happened," and "Enron and WorldCom  Lessons to be Learned?").
[2] For examples of bases for rates of return that other states have considered reasonable for the purpose of imputing investment income, see, e.g., Ohio Rev.Code Ann. § 3119.01(C)(11)(b) (West 2003) (interest rate not to exceed "federal short-term rate"); Vt. Stat. Ann. tit. 15, § 653(5)(A)(i) (2003) ("current rate for long-term United States Treasury Bills"); W. Va.Code Ann. § 48-1-205(d) (Michie 2001) (assets considered underperforming if they do not produce income at rate equivalent to "current six-month certificate of deposit rate or such other rate that the court determines is reasonable").