**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3217-15T2

NEIL ROSS,

      Plaintiff-Respondent/
      Cross-Appellant,

v.

GIULIANA ROSS,

      Defendant-Appellant/
      Cross-Respondent.

_____

Argued December 12, 2018 – Decided January 17, 2020

Before Judges Koblitz, Ostrer and Currier.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Essex County, Docket No. FM-07-1240-07.

Karin Duchin Haber argued the cause for appellant/ cross-respondent (Haber Silver & Simpson, attorneys; Karin Duchin Haber, of counsel; Jani Wase Vinick, on the briefs).

Bonnie C. Frost argued the cause for respondent/cross-appellant (Einhorn Barbarito Frost & Botwinick, PC, attorneys; Bonnie C. Frost, of counsel and on the brief).

The opinion of the court was delivered by

OSTRER, J.A.D.

In this post-judgment matrimonial litigation, defendant Giuliana Ross appeals from the trial court's order, entered after a plenary hearing, reducing the alimony and child support obligations of her former husband, Neil Ross. Neil[1] suffered a vestibular stroke in July 2012. It left him unable to continue earning an income as an anesthesiologist. Giuliana argues the court erred in finding a permanent, significant change in circumstances. She contends that notwithstanding Neil's stroke, he could have earned enough income to meet his support obligations had he not transferred his practice without compensation after the stroke. The trial court determined that even after imputing income to Neil for the transfer, he was unable to meet his previous obligations and a reduction was justified. Although we depart from some of the trial court's reasoning, we affirm the trial court's modification. We also affirm the court's denial of attorney's fees to both parties, which Neil challenges on cross-appeal.

---

[1] For convenience, and without intending any disrespect, we refer to the parties by their first names.

I.

The parties divorced in 2008. Then in his late forties, Neil was a successful anesthesiologist in a multi-physician practice, Summit Anesthesia. His gross income was roughly $550,000 a year. Under their property settlement agreement, Neil agreed to pay Giuliana $13,000 in monthly alimony for four years, dropping to $11,000 thereafter. They agreed that Neil's retirement at age 62 would be a change of circumstances that would justify terminating or modifying alimony. Neil also agreed to pay $60,000 a year in child support for the parties' three children, which would drop $20,000 a year as each child became emancipated. The parties divided a substantial amount of assets, including Neil's interest in his practice and three other entities, which they agreed to value at $880,000.

After the divorce, Neil struck out on his own. Rather than receive payment for his interest in his old practice, he took with him one significant client, an out-patient surgical center. Metropolitan Surgery Center, LLC (Metropolitan), agreed to exclusively use Neil's new practice, Pinnacle Anesthesia Consultants, LLC (Pinnacle) for anesthesiology services. But each entity could terminate the arrangement without cause on ninety days' notice. Under their agreement, Neil served as Metropolitan's Director of Anesthesiology.

A-3217-15T2

Pinnacle hired other physicians to help Neil meet Metropolitan's needs. Included among those was Dr. Chirag Shah. In 2011, Neil brought him in as a future member of the LLC. If all went well, they agreed Dr. Shah would become an equal owner of the practice after four years. If Neil sold the practice to a third party, Dr. Shah would receive 12.5 percent after his first full year under the agreement, twenty-five percent after the second, and fifty percent after the third. The employment agreement also provided incentives for Dr. Shah to bring in new clients.

However, Neil and Dr. Shah were unable to broaden Pinnacle's client base and reduce dependence on Metropolitan. In May 2012, Neil entered into a multi-year contract with Bloom Metro, Inc. (BMI), run by Henry Bloom. BMI agreed to provide Pinnacle "turnkey management services," and to seek additional work for the practice. In return, BMI would receive seventy percent of Pinnacle's net cash flow. But the parties effectively left open the actual amount of BMI's fee, and Neil's subsequent income. That is because their contract defined "net cash flow" as the gross cash receipts minus expenses, such as Neil's salary, as identified in an annual budget that both BMI and Pinnacle would have to approve later.

A-3217-15T2

Less than two months after signing the BMI contract, Neil suffered the stroke that left him significantly disabled. He was a month shy of his fifty-second birthday. His physician opined that his neurological deficits made him unable to return to work or practice medicine.[2] He was ineligible for malpractice insurance. Consequently, he could no longer serve as Metropolitan's Director of Anesthesiology. Dr. Shah and other physicians stepped in to meet Metropolitan's needs.

In 2011, the year before his stroke, Neil's total income topped $1.5 million, consisting of more than $558,000 in salary, and over $1 million in business income from Pinnacle. After his stroke, his income dropped precipitously. His salary for January to August 2012 was over $442,000, but he earned no salary for the rest of the year. His 2012 business income dropped to $365,000 – as Pinnacle had to hire physicians to take his place. Neil's total 2012 adjusted gross income was roughly $724,000.

---

[2] Over a year after his stroke, Neil testified that he had difficulty reading and writing; he was plagued with dizziness and vertigo; he could not drive a vehicle; half his face was persistently numb; he could not drink and eat at the same time; his dysphasia led to pneumonia twice in a nine-month period; he lacked temperature sensation on one side of his body; and he walked with a slap gait that caused joint pain.

In 2013, his income fell even more. He earned no salary, and, according to his tax return, he received no business income from Pinnacle. BMI managed the administrative side of the practice, although Neil remained minimally involved, signing checks that BMI had prepared. He paid BMI $280,000 in 2013, although he received no invoices. By the middle of the year, Dr. Shah became board certified, which qualified him to become Metropolitan's Director of Anesthesiology. Dr. Shah also took over the check signing. A forensic accountant testified, on Giuliana's behalf, that Pinnacle and its billing affiliate generated $270,000 in pretax cash flow in 2013. The affiliate handled the out-of-network billing for patients Pinnacle's physicians treated. In the meantime, Neil began receiving Social Security Disability income of roughly $29,000 a year, as well as payments from two private disability insurance policies, which totaled roughly $15,000 a month.

On December 31, 2013, Neil transferred his interest in Pinnacle and the billing affiliate to Dr. Shah for a nominal $2. Neil retained liability for a $71,000 loan he had taken. Neil argued that he did not believe that Pinnacle had value because Metropolitan could terminate the contract for no reason on ninety days' notice.

6

Metropolitan's medical board president testified that Metropolitan renewed its contract with Pinnacle after Neil's stroke, and saw no reason to terminate it. The contract did not prevent Neil from retaining ownership. But, Dr. Shah testified that he was unwilling to remain at Pinnacle if he did not assume ownership, because he was performing all the work that Neil used to do. He also opposed paying Neil a salary if he was unable to work.

Giuliana's income was quite modest compared to Neil's. Although she held an M.B.A., she worked part-time in medical billing for an orthopedic practice, earning $19,422 in 2012. Once Neil started receiving Social Security Disability, Giuliana began receiving dependent benefits of roughly $400 a month for each child. She was the CEO or director of several real estate investment firms owned by her brother-in-law and a friend, who did not live in the United States. She received $1000 a month for thirty to forty hours of work performing various tasks for the firms. She also inherited properties in Italy and Israel after her mother passed away. No valuation of those properties was provided. An employability expert Neil retained testified that Giuliana was capable of earning $89,000 to $175,000 a year.

## II.

The trial court concluded that Neil satisfied his burden of demonstrating a permanent change in circumstances that negatively affected his ability to pay support. The court reviewed Neil's physical limitations and his need for ongoing care and therapy. Although his post-divorce income rose substantially before the stroke, he was now disabled, his condition "imped[ed] his ability to work," and he could not practice anesthesiology. The court stated, "[T]he real issue is whether or no[t] plaintiff has the ability to continue to operate and generate income from his two businesses and what he did with the businesses post-stroke . . . ."

The court reviewed Neil's agreement to transfer Pinnacle to Dr. Shah, and Pinnacle's contracts with Metropolitan and BMI. The court found the BMI agreement "somewhat suspect" because it transferred seventy percent of Pinnacle's net cash flow; and "curious" because Neil entered the agreement around the time defendant had requested increased support. But, the court ultimately declined to find, as defendant had urged, that Neil's post-stroke payments to BMI proved that he intended to draw income from Pinnacle, after he transferred ownership. The court noted that Neil could have used his $180,000 payments to BMI to pay support, but did not impute that as income.

A-3217-15T2

The court concluded that it also did not "make sense" and was "quite suspect" that Neil "gave away" Pinnacle for $2. It was also "curious" that he retained liability for a $71,000 loan. Noting that Metropolitan's contract remained in force for four years, generating significant business income, the court rejected Neil's argument the contract lacked value because either side could terminate on ninety days' notice. The court concluded that Neil "should have preserved this asset or gotten some value for it," which he could have used to pay support. Instead, Neil failed to "use . . . even reasonable efforts, to maximize or preserve this asset . . . ."

The court declined to find the transactions with BMI and Shah were shams and that Bloom or Dr. Shah had secretly agreed to share income with him, or that Dr. Shah had promised to return Pinnacle to him in the future. But, the court required Neil to disclose his tax returns for six years, to enable defendant to discover evidence of any such agreement if it existed.

The court decided "to impute some income" to Neil for the sale of the business. But, absent any expert valuation testimony, the court struggled to value Neil's interest in Pinnacle. The court ultimately set a value of $800,000. The court derived that figure by averaging 2011 and 2012 net profits of $1 million and $600,000, respectively. The court presumed that Dr. Shah would

share equally in the proceeds of a hypothetical sale, leaving $400,000 gross for Neil, which would be reduced to $200,000 after tax. The court added that amount to Neil's $213,000 in income from Social Security and his disability policies, to arrive at an estimated imputed total income of $413,000 for 2013. The court then further reduced the amount by taxes, and found his total actual and imputed after-tax income in 2013 to be "somewhere in the range of $300,000."[3]

The court then scrutinized Neil's expenses as set forth in his case information statement. After numerous reductions, the court found Neil needed $199,164 to cover his expenses. That left over $100,000 for support payments in 2013.

The court then reviewed Giuliana's income and expenses, to determine her needs. The court imputed income to her based on working thirty hours a week, as Giuliana failed to justify working only fifteen hours a week. After including investment income, the court calculated 2013 gross income to be $68,560, and net income $51,420. The court omitted the $1200 a month, $14,400 a year, in

---

[3] The court noted that by the time Neil suffered his stroke in July 2012, he had already earned $766,634 that year, which exceeded his annual income when the parties entered into the PSA. Therefore, the court found no change of circumstances for 2012, and continued the preexisting support obligations for 2012 established by the PSA.

A-3217-15T2

disability payments she received for the children. Although the court found it "curious" that she received only $12,000 as the CEO or director of several real estate companies, the court declined to find she earned more and rejected Neil's request that the court impute a higher income for her work. Yet, the court ordered Giuliana to disclose her tax returns for the next six years, to enable Neil to monitor her income.

After scrutinizing and reducing various items in Giuliana's case information statement, the court found that Giuliana's annual budget totaled $148,632 for 2013. That left a deficit of roughly $100,000, which matched Neil's imputed surplus. For that year, the court set alimony at $7500 a month ($90,000 for the year) and child support at $178 a week ($9256 for the year).

For 2014, the court assumed that Neil's only income would consist of his Social Security and disability insurance payments. The court also assumed that Neil and his wife would move into a less expensive home, reducing his shelter costs by $24,000, resulting in an annual budget of $179,000. The court held that left an excess of "around 35, 40,000," although his $213,000 income was actually only $34,000 more than his needs. The court found that Giuliana's needs remained the same as the previous year. The court ordered that, as of January 1, 2014, Neil was obliged to pay $3500 a month in alimony and $159 a

week in child support, which amounted to an annual total of almost $51,000 – $42,000 in alimony and $8268 in child support. That exceeded Neil's $34,000 surplus by $17,000, resulting in a deficit in his ability to cover his own expenses.

Effective March 1, 2014, the child support obligation was further reduced to $135 a week to account for the fact that one of the children began to live with Neil. The court also ordered the parties to split children-related expenses on a sixty-forty percent basis beginning January 1, 2014, and to share those expenses equally beginning on March 1, 2014.

After the court issued its decision, each party moved for counsel fees. The court rejected both applications for reasons we discuss below.

This appeal followed.

### III.

Giuliana contends Neil failed to suffer a permanent and significant change in circumstances warranting a modification of support because his loss of substantial business income was "wholly voluntary and unjustifiable." Alternatively, if the court correctly found a change in circumstances, she argues the court erred in how it imputed income to Neil. She contends the court should have imputed business profits to Neil on an ongoing basis, rather than attributing the proceeds of an imputed sale in a single year. Even so, she contends the court

used a flawed methodology in valuing Pinnacle; miscalculated and double-taxed Neil's share of the imputed share proceeds; and improperly compared Neil's pre-divorce gross income with his post-stroke net income.

We discern no error in the court's determination that Neil proved the prerequisite change in circumstances. For reasons that do not entirely coincide with those Giuliani presents, we agree that the court's method of valuing Pinnacle and imputing income was flawed. But we conclude Giuliana did not suffer prejudice.

The court is "authorized to modify alimony and support orders 'as the circumstances of the parties and the nature of the case' require." Halliwell v. Halliwell, 326 N.J. Super. 442, 448 (App. Div. 1999) (quoting N.J.S.A. 2A:34-23). We review the trial court's modification ruling for an abuse of discretion, with deference to the Family Part judge's expertise. Costa v. Costa, 440 N.J. Super. 1, 4 (App. Div. 2015).

Neil had the burden to show the prerequisite changed circumstances. See Lepis v. Lepis, 83 N.J. 139, 157 (1980). Not any change in circumstances suffices; rather the changed circumstances must be such "as would warrant relief" from the obligations involved. Ibid. Since Neil, as the supporting spouse, sought a reduction in his obligation, the central issue was his ability to pay. See

Miller v. Miller, 160 N.J. 408, 420 (1999). In assessing Neil's ability, the court was obliged to consider not only his earned income, but also investment income from his assets. Id. at 422.

Without dispute, Neil suffered a permanent loss of functioning due to the stroke that disabled him from earning an income practicing anesthesiology. Cf. Lepis, 83 N.J. at 151 (stating that "[c]ourts have consistently rejected requests for modification based on circumstances which are only temporary"). His disability benefits were less than the income upon which his support obligations were based. Nonetheless, Giuliana argues that Neil failed to satisfy the threshold showing for a modification because, she contends, he voluntarily reduced his business income by shedding Pinnacle. She cites, among other cases, Aronson v. Aronson, 245 N.J. Super. 354, 360-61 (App. Div. 1991), in which the court declined to find the prerequisite change in circumstances because the obligor, a dentist, could have earned more despite pressures on his practice, but he voluntarily chose not to do so. Giuliana contends that if the business income Neil allegedly gave up were added to his disability benefits, his total income and ability to pay support would not have suffered a change from the pre-divorce level.

The argument rests on factual premises that the trial court simply did not make.[4] The court did not find that Neil could physically continue to run the business-side of the practice, while BMI handled the administration and Dr. Shah led the medical providers. Neil had significant difficulty performing even basic written communications.

Nor did the court expressly find it would have been tenable for Neil to retain a profitable interest in Pinnacle as an entirely passive investor. Indeed, the evidence raised serious question that Neil could have done so. Giuliana highlights that Metropolitan renewed its contract after Neil's stroke, and its board chair saw no reason to believe that it would not be renewed in the future. However, the issue was not whether Metropolitan would be content to continue to pay a Neil-owned Pinnacle, for services that Dr. Shah and his team provided. The key issues were, first, whether Dr. Shah would tolerate such an arrangement. He said he would not. Second, whether Metropolitan would have continued to utilize Pinnacle if Neil passively owned it, but entirely new anesthesiologists staffed it, while Dr. Shah practiced in a competing group. Metropolitan's board chair was not asked that question.

---

[4] As we reject Giuliana's argument, we need not address whether Neil's disability insurance benefits would have been reduced to account for his business income.

The court concluded that Neil "should have preserved this asset or gotten some value for it" to enable him to pay support. The court determined, in the exercise of its discretion, that some income should be imputed for Neil's failure to maximize income from his interest in Pinnacle. See Miller, 160 N.J. at 425 (concluding it was "appropriate to impute a reasonable income from plaintiff's investments comparable to a prudent use" of them). However, even after the court's imputation, Neil lacked the ability to pay support at the level agreed in the PSA.

We therefore turn to the court's imputation. Although imputation of income is a discretionary matter, we will not hesitate to disturb findings that apply a rigid formula that overlooks the unique facts and circumstances of the case. See Overbay v. Overbay, 376 N.J. Super. 99, 108-09 (App. Div. 2005) (reversing method of imputing investment income to supported spouse).

The court's imputation was closely tied to its valuation of Neil's interest in Pinnacle. The court calculated the value based on the average net cash flow over a two-year period. This valuation was untethered to a generally accepted methodology. See Balsamides v. Protameen Chem., Inc., 160 N.J. 352, 375 (1999) (stating that "'an assessment of fair value requires consideration of proof of value by any techniques or methods which are generally acceptable in the

16

financial community'") (quoting 1 John R. McKay II, New Jersey Business Corporations, § 9-10(c)(1) (2d ed. 1996) (additional internal quotation marks and citations omitted); Bowen v. Bowen, 96 N.J. 36, 49 (1984) (stating that "a court should not base an opinion on theories of value that lack support in the record, demonstrated market reliability, or general acceptance").  The three main methods for valuing an interest in a closely held business are "the income or capitalized earnings method, the market approach method, and the cost approach method."  Steneken v. Steneken, 183 N.J. 290, 297 (2005).  The ultimate measure of a valuation technique is its reasonableness.  Ibid.

Although the trial court's methodology lacked support, we accept the court's conclusion regarding value.  Absent competing expert opinion, we find sufficient alternative support in the record for the court's $800,000 valuation – consisting of the parties' own $880,000 valuation of Neil's pre-divorce, partial interest in Summit Anesthesiology, and three other entities.  Neil transferred his interest in Summit to his former colleagues in return for the contract with Metropolitan.  Assuming that the $880,000 was attributed solely to Neil's share of Summit, that valuation serves as the basis for setting a market value for the Metropolitan contract when Neil purchased it.

The value of a prior transaction is an accepted basis for valuing an interest in a closely-held business. "Value is estimated, based on the prior-transactions method, by examining sales transactions relating to the subject company. These transactions may provide some of the best evidence of value, provided they are arm's-length transactions occurring reasonably near the valuation date." Edwin J. Terry, Jr., Neil J. Beaton & J. Kenneth Huff, Jr., The Nature of the Beast, 25 WTR Fam. Advoc. 35, 37 (2003); see also Rev. Ruling 59-60, 1959-1 C.B. 237, § 4.01(g) (I.R.S. Jan. 1, 1959) (stating that the prior "[s]ales of stock and the size of the block of stock to be valued" are among factors to be analyzed in valuing an entity).[5]

Pinnacle's principal asset was the Metropolitan contract. An imputed sale would be based primarily on that contract's value. Pinnacle had no other clients,

---

[5] We recognize that other factors may render a prior transaction an unreliable indicator of value. For example, the prior transaction itself may not reflect market value at the time, if it were not arm's length, or were a distress sale. Or the nature of the entity's business may have improved or worsened since the prior transaction. See Robert D. Feder & Todd A. Zigrang, Valuing Specific Assets in Divorce, § 10.04 (2019). We presume that a key factor in Neil's decision to enter the transaction was his confidence in his existing relationship with Metropolitan. A party with no prior relationship with Metropolitan would likely have paid significantly less for the contract. See Donald Sonneman, The Single Customer Business – Valuation of a Captive Business, 19 Business Valuation Review 1, 44 (March 2000) (addressing the difficulty in valuing a single customer business and noting that a significant factor is the strength of the business's relationship with its customer).

despite efforts to secure them. Two significant circumstances would tend to reduce the value of Neil's imputed resale of his interest to a third party. First, Neil's sale would have been a forced or distress sale, as he had suffered a stroke and could no longer manage the practice or treat patients. Second, an unrelated third-party buyer would face a significant risk that Neil did not face when he acquired the contract: losing the contract to an ensconced competitor. Dr. Shah testified that he believed he was entitled to assume ownership without any payment. It is unclear whether Metropolitan would have remained with Pinnacle, owned by strangers, rather than send its work to Dr. Shah, operating a different entity. Neil had no opportunity to bring in someone new and assist that person in building a relationship with Metropolitan as he had with Dr. Shah. Even if Neil had tried to sell Pinnacle to Dr. Shah, there is no reason to believe that Neil would have secured from Dr. Shah more than Neil had "paid" himself, particularly given the promise of a fifty-percent equity interest by 2015. For these reasons, we do not disturb the trial court's determination that Neil could have sold his interest in Pinnacle for $800,000 (although the circumstances may have justified a significantly lower value).

As Giuliana correctly contends, Neil's contract with Dr. Shah required him to share twenty-five percent of the proceeds of such a sale in 2013 – not fifty

percent as the court presumed. That would have reduced the proceeds to Neil to $600,000. Also, as Giuliana correctly contends, the court overestimated taxes from the sale. The proceeds would not constitute ordinary income, but would constitute a capital gain. Assuming a fifteen percent federal long term capital gains tax and at least a five percent New Jersey bracket (the state gross income tax does not differentiate between capital gains and earned income), Neil would be left with $480,000 from an imputed $800,000 sale to a third party.[6]

However, the court erred by converting Neil's equity into income. Neil was entitled to preserve the principal proceeds of the sale. A party's assets are relevant in the alimony calculation because of the income they could generate. See Miller, 160 N.J. at 420-21. Notably, Neil's interest in Pinnacle was derived from his interest in Summit, which was already subject to equitable distribution. Giuliana was not entitled to distribution a second time.

Neil would have been entitled to invest the proceeds and to conserve the asset, particularly given his health condition and his loss of earning capacity in the future. Unlike the obligor in Miller, Neil was not a professional investor

---

[6] We recognize that Neil may have had a basis in the asset that would have resulted in a capital gains tax of a lesser amount. But, neither party provided evidence on this point.

with a multi-million dollar portfolio. Id. at 416. He was a disabled man then in his early fifties who needed to preserve his assets for the years to come, when his private disability insurance payments ceased.[7]

As we noted in Overbay, the corporate bond index rate of return that was imputed in Miller does not fit every circumstance. Overbay, 376 N.J. Super. at 108. We held that a more conservative investment strategy should be imputed in that case. Ibid. Even assuming income based on the rate attributable to a corporate bond index used in Miller, Neil would have generated three or four percent a year. Moody's Seasoned Aaa Corporate Bond Yield, FRED (Dec. 3, 2019), https://fred.stlouisfed.org/series/AAA). In other words, the court could have reasonably imputed a gross investment income of $14,400 to $19,200 a year. Assuming a combined marginal federal and state income tax rate of roughly forty percent, Neil would have generated after-tax investment income of $8,640 to $11,520 a year.

Instead of allocating some portion of that annual income to Neil's support obligation on an ongoing basis, the court required Neil to pay support in 2013 that included $100,000 of the $200,000 proceeds that the court attributed to Neil from the hypothetical sale, after accounting for Dr. Shah's share and taxes.

---

[7] Benefits under one policy in the record would stop at age sixty-five.

A-3217-15T2

Giuliana argues that the court erred in providing a one-shot payment. Had the court attributed to Giuliana's support as much as half of Neil's annual imputed investment income of $8,640 to $11,520 on the imputed proceeds of the sale, Giuliana would have received $4,320 to $5,760 a year. We discern no injustice requiring our intervention, where the court instead shifted $100,000 from Neil to Giuliana in a single year based on its imputed sale.

Giuliana's remaining points regarding the modification of support require only brief comment. The court was not compelled to impute income from Neil's equity in his home, which he owned with his current wife. Nor was a failed investment in 2010 a basis for imputing additional income. The court properly considered Giuliana's investment income, because she actually received it. Although the trial court did not expressly consider that Neil's alimony payments were deductible to him, and taxable to Giuliana, that does not provide a basis to alter the support modification, particularly inasmuch as the court allocated all of Neil's budget surplus, plus $17,000, to Giuliana's support; and the court did not account for Giuliana's receipt of Social Security Disability payments for the children. Finally, the court did not abuse its discretion by modifying the allocation of children-related expenses, including educational expenses, in light of Neil's changed circumstances.

A-3217-15T2

IV.

Lastly, we turn to the issue of attorney's fees. Both parties challenge the court's order denying their respective applications for fees. "The assessment of counsel fees is discretionary." Slutsky v. Slutsky, 451 N.J. Super. 332, 365 (App. Div. 2017). Appellate courts "disturb a trial court's determination on counsel fees only on the 'rarest occasion,' and then only because of clear abuse of discretion." Strahan v. Strahan, 402 N.J. Super. 298, 317 (App. Div. 2008) (quoting Rendine v. Pantzer, 141 N.J. 292, 317 (1995)). We are satisfied that the court adequately considered the factors set forth in Rule 5:3-5(c):

> (1) the financial circumstances of the parties; (2) the ability of the parties to pay their own fees or to contribute to the fees of the other party; (3) the reasonableness and good faith of the positions advanced by the parties both during and prior to trial; (4) the extent of the fees incurred by both parties; (5) any fees previously awarded; (6) the amount of fees previously paid to counsel by each party; (7) the results obtained; (8) the degree to which fees were incurred to enforce existing orders or to compel discovery; and (9) any other factor bearing on the fairness of an award.
>
> [R. 5:3-5(c).]

Regarding factor one, the court found that while Neil's monthly income was roughly twice Giuliana's, Giuliana's net worth was roughly double Neil's. Given the parties' substantial assets, and the fact that they already had paid over

23

half their legal expenses, each had the ability to pay his or own fees, but lacked the ability to contribute to the other's without significantly depleting income or assets. The court found that both parties asserted reasonable positions prior to and during the hearing, and rejected each party's contention that the other acted in bad faith. Both parties incurred substantial fees, although Neil's fees were significantly higher than Giuliana's. The court noted that both parties obtained some relief. Neil wanted to terminate support and Giuliana wanted to preserve it unaltered. The court maintained Neil's support obligation, but modified it. The court concluded that each party should pay his and her own attorney's fees.

We recognize that the court did not expressly address factor eight, and that Giuliana incurred legal fees in attempting to enforce a September 2012, order regarding the proceeds from the sale of plaintiff's property. On the other hand, Neil points to failures by Giuliana to provide discovery about her inheritance and other aspects of her finances, which were uncovered only through Neil's independent investigation.

We also find insufficient support in the record for Neil's contention that the court overestimated his income. He claims the benefits under one of his private disability policies ceased in January 2015, but the policy in the record

states benefits would continue until age sixty-five. In any event, the court found that Giuliana could not afford to pay Neil's fees.

To the extent not addressed, the parties' remaining points lack sufficient merit to warrant discussion. R. 2:11-3(e)(1).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3217-15T2